No. 98-123

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 325

297 Mont. 327

993 P.2d 667

IN RE THE CUSTODY OF J.C.O.;

STEVE WORKMAN,

Petitioner and Appellant,

v.

MARLO OLSZEWSKI,

Respondent and Respondent.

APPEAL FROM: District Court of the Eighth Judicial District,

In and for the County of Cascade,

The Honorable Kenneth R. Neill, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Nathan J. Hoines, Attorney at Law, Great Falls, Montana

For Respondent:

Marlo Olszewski, *Pro Se*, Great Falls, Montana

_____

Submitted on Briefs: December 2, 1999

Decided: December 22, 1999

Filed:

_____

Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

1. ¶ Appellant Steve Workman (Steve) filed a petition in the District Court to establish paternity, support and custody. The matter proceeded to trial before the Hon. Kenneth R. Neill. The District Court entered its Findings of Fact, Conclusions of Law and Order on December 22, 1997. Steve appeals from that part of the order determining that the child born of the parties shall have the surname of Olszewski, the Respondent's surname from a prior marriage. We affirm.

2. ¶ Marlo Olszewski (Marlo) and Steve had a short-term relationship which resulted in the birth of J.C.O. on July 18, 1996. The child's mother, Marlo, had the birth certificate issued in her name of Olszewski; he was also baptized under that name. Olszewski is the mother's legal name and has been her exclusive surname for over ten years. Ashley Olszewski is the child's sister's legal name. The child resides with his mother.

3. ¶ The issue presented is whether the District Court abused its discretion in concluding that it was in the child's best interest that he carry the surname of "Olszewski."

4. ¶ The District Court, in concluding that it was in best interest of the minor child to

carry the last name of "Olszewski," found:

The Court finds it to be in the best interests of the child that the name remain "Olszewski" based on the following facts: the child has carried said name for the first year and one-half of his life; he was baptized in that name; the mother will be the primary care-giver; the mother and half-sister have the same last name; the mother stated she would not change her last name even in the event of remarriage; the father did not support the child until ordered by this Court to do so and for the foreseeable future the mother will clearly be supplying the majority of the support.

5. ¶ Steve argues that the District Court abused its discretion since "Olszewski" has no connection to Steve, the natural father; Steve was not listed on the child's birth certificate; and he did not have any say in what name was chosen for the child's first, middle or last name. Steve is the only son of Spencer Workman and he argues that if the minor child's last name is not "Workman," the name "Workman" will not be carried on into future generations. Steve relies on Overtone v. Overtone (1983), 207 Mont. 292, 674 P.2d 1089, in support of his argument that the District Court should have changed the child's name to his natural father's surname. He contends that the District Court overlooked the factors set forth in *Overtone*.

6. ¶ We begin our analysis with Fireman v. Fireman (1980), 187 Mont. 465, 610 P.2d 178. Fireman, the natural father, argued that the district court abused its discretion in allowing his two children to use the surname they preferred. Fireman contended that this further estranged him from his children. This Court agreed, noting that at common law, a person could adopt any surname he might choose so long as the change was not made for fraudulent purposes. *Fireman*, 187 Mont. at 469, 610 P.2d at 181. "Thus, absent a statute to the contrary, the widespread custom in this country of giving a child the surname of his father is a matter of choice rather than law." *Fireman*, 187 Mont. at 469, 610 P.2d at 181. For issues concerning the relationship of a father and his child, the court concluded that the overriding principle is the best interests of the child. Given that Fireman and the children had lived in the same community and manifested an abiding interest in each other and that Fireman had consistently fulfilled his support obligation, the Court determined that it was in the best interests of the children that they use his surname. *Fireman*, 187 Mont. at 470, 610 P.2d at 181. The Court concluded:

Thus until the children reach an age where they can fully understand the circumstances surrounding their parents' marriage dissolution, the District Court

should not permit an unnatural barrier to come between Dale and the children. Such a barrier can only further estrange Dale and the children.

*Fireman*, 187 Mont. at 470, 610 P.2d at 181.

7. ¶ *Fireman* established that selection of a child's surname is a matter of choice, not law; that a district court, in determining whether to change a child's surname, must be guided by the child's best interests; and finally, that this Court reviews a district court's determination of best interests under an abuse of discretion standard. *Fireman*, 187 Mont. at 469-70, 610 P.2d at 181.

8. ¶ In 1983, we decided *Overtone*. Overtone and his wife Louise were divorced in 1980, at which time Louise was pregnant. Louise, who had two other out-of-wedlock children with the surname Miller, desired that all of her children have the same name so as to prevent confusion and embarrassment; thus, the child was named Miller. *Overtone*, 207 Mont. at 293, 674 P.2d at 1090. The father subsequently brought an action to have the surname changed to Overtone and to clarify his visitation rights. The district court ordered that the child's name be changed to her father's surname, Overtone. *Overtone*, 207 Mont. at 294, 674 P.2d at 1098. On appeal, we cited *Fireman* for the "best interest of the child" test and concluded that the district court had correctly applied that test without suggesting that the father had any preference or natural right to have his daughter bear his surname. *Overtone*, 207 Mont. at 295-96, 674 P.2d at 1091.

9. ¶ Our most recent decision on point is Matter of Iverson (1990), 241 Mont. 140, 786 P.2d 1. In *Matter of Iverson*, an unwed mother petitioned to change her child's surname from that of his acknowledged father, Iverson, who had reneged on a promise to marry her. Iverson contended that he had attempted to maintain contact with the child after his break up with the mother, but that she thwarted any such attempts. He also maintained that he had continually paid child support. *Matter of Iverson,* 241 Mont. at 142, 786 P.2d at 2. The district court considered the evidence, some of which was conflicting, and determined that the proposed name change would not be in the child's best interest in light of the fact that Iverson had acknowledged paternity, paid child support, and sought a court order granting him visitation rights. *Matter of Iverson,* 241 Mont. at 143, 786 P.2d at 2.

10. ¶ On appeal we stated that, "[r]eview of a district court's ruling in these matters is very narrow. A lower court's decision regarding the best interest of the child will not be overturned on appeal unless there is a clear abuse of discretion." *Matter of Iverson,* 241 Mont. at 141, 786 P.2d at 2. Citing *Overtone*, we reiterated that we will

not substitute our judgment for that of the trier of fact, that findings will not be overturned unless there is a clear preponderance of the evidence against them, and that we will view the evidence in a light most favorable to the prevailing party. *Matter of Iverson,* 241 Mont. at 141-42, 786 P.2d at 2 (citation omitted).

11. ¶ Applying the above principles, we determined that there was substantial evidence to support the court's conclusion and that the district court did not clearly abuse its discretion. *Matter of Iverson,* 241 Mont. at 143, 786 P.2d at 2. Justice Barz dissented, contending that the district court abused its discretion in determining that the father's acknowledgment of paternity, payment of support and his efforts at visitation somehow outweighed the fact that the mother acknowledged maternity, assumed day to day care of the child and, more likely than not, paid more support than the father. She suggested that without specific guidelines "the traditional preference for the father's name will continue and a subtle form of discrimination against women will prevail." *Matter of Iverson,* 241 Mont. at 144, 786 P.2d at 4 (Barz, J., dissenting).

12. ¶ Considering the results in *Fireman*, *Overtone* and *Matter of Iverson* (in each case the father prevailed regardless of whether he was the challenger or defender of the given surname), Justice Barz's concern about the subtle "preference" for the father's surname appears justified. The present case is the first appeal to reach this Court in which the District Court has upheld use of the mother's surname. In doing so, the District Court focused on the best interests of the child rather than the parents. The court observed that the child has carried the name of his mother for the first year and one-half of his life; that he was baptized in the name of Olszewski; that the mother will be the primary care-giver; that the mother and half-sister have that same last name; and that the mother represented that she would not change her last name even in the event of remarriage.

13. ¶ We conclude that the District Court correctly applied the "best interests of the child" standard in a nonsexist, nonpaternalistic manner, focusing on the concerns of the child as opposed to a concern with the wishes of either parent; and in particular, whether the father's surname of Workman will be carried on into future generations. The District Court did not abuse its discretion in determining that it is in the best interests of the child to carry the mother's surname of "Olszewski."

14. ¶ Affirmed.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ WILLIAM E. HUNT, SR.

/S/ JIM REGNIER

/S/ TERRY N. TRIEWEILER

Justice James C. Nelson specially concurs:

¶ I concur in our opinion. Nonetheless, I write separately to express my specific agreement with former Justice Diane Barz's dissent in *Matter of Iverson* (1990), 241 Mont. 140, 786 P.2d 1. Like Justice Barz, I believe that guidelines should be adopted to focus the analysis of the district courts in applying the "best interest" test in these sorts of cases. I agree with her that, without guidelines, courts nominally applying the best interest test may still subtly discriminate against the equal right of the child's mother to bear her surname.

¶ I start with the principle that under Article II, Section 4 of Montana's Constitution the dignity of the human being is inviolable; that no person shall be denied equal protection of the laws; and that neither the state nor any person, firm, corporation or institution shall discriminate against any person on account of, among other things, sex. Clearly, this provision of Montana's Constitution guarantees that a mother has as much right to have her child bear her surname as does a father and that a child has as much right to bear its mother's surname as it does its father's. Just as clearly, then, when it is incumbent on a court to decide whose surname a child shall bear, the judge's decision must be grounded in something more than the paternalistic notion prevalent in our society that, all things being equal, a child should bear the surname of its father.

¶ Unfortunately, as Justice Barz correctly observed, it is precisely this discriminatory perception that runs implicitly through our three prior cases that have considered this issue: *Firman v. Firman* (1980), 187 Mont. 465, 610 P.2d 178; *Overton v. Overton* (1983), 207 Mont. 292, 674 P.2d 1089; and *Iverson.* While use of the best interest test alone produced the correct result in favor of the mother in the case at bar, nonetheless, as we correctly note, in each of our three prior cases, by applying this test alone, the father always prevailed. In each of these decisions, I believe that use of the best interest test served as little more than a transparent justification for blindly applying our society's custom of naming children after their

fathers without any real consideration of the equal constitutional right of mothers to have their children bear their surname.

18. ¶ For example, in *Firman*, our first case to consider this issue, the father petitioned to require the children to use his surname. The children's legal surname remained Firman, but, the children wanted to use the name of their stepfather, Hauser, with whom they were living, in school to avoid inquisitive peers. The trial court ruled that the children could use any surname they preferred. We reversed. *Firman,* 187 Mont. at 470, 610 P.2d at 181.

19. ¶ We stated that, at common law, a person could adopt any surname he might choose so long as the change was not made for fraudulent purposes and that, in this country, the child's use of its father's surname was primarily a matter of choice rather than law. *Firman*, 187 Mont. at 469, 610 P.2d at 181. Noting that there was no Montana statute on point, we then fell back on "general principles, the most important of which in any proceeding concerning the relationship of a father and his child is the best interest of the child." This Court then went on to conclude that since the father and his children lived in the same community and had an abiding interest in each other, and, since the father consistently supported his children, the district court should "not permit an unnatural barrier to come between [the father] and the children." *Firman,* 187 Mont. at 470, 610 P.2d at 181.

20. ¶ As Justice Barz perceptively observed: "In *Firman* . . . [t]he use of the words 'unnatural barrier' are in themselves language that suggests a preference for the father's name." *Iverson*, 241 Mont. at 145, 786 P.2d at 4 (Barz, J., dissenting). Moreover, and as Justice Barz also observed in *Iverson*, the "best interest" criteria we relied on in *Firman* to require the children to use the father's surname--parent living in same community with children; parent supporting children; barrier posed by parent and children having different surnames--were equally applicable to the children's mother.

21. ¶ In our next case, *Overton*, the child was born after the parties' dissolution. The mother, Cynthia (Miller) (Overton) had two other illegitimate children with surnames Miller and, in giving that surname to her daughter at birth, she desired that all her children have the same last name to avoid confusion and embarrassment. The father, among other things, petitioned to change the child's name to his and to place his name on the birth certificate. Ostensibly, the father's petition was premised on his desire to enroll his daughter in an Indian tribe, although nothing in our opinion suggests that she could not be enrolled under the surname Miller. In any event, the trial court granted this petition and we affirmed. *Overton*, 207 Mont. at 296, 674 P.2d at 1091.

22. ¶ Citing *Firman,* but without analysis of what factors the trial court actually considered, we simply noted that nothing in the district court's findings and conclusions stated that the father had a preference or natural right to have his daughter bear his surname; that the court's use of the best interest test did "not involve the equality of the sexes;" and that the court's findings and conclusions were not clearly erroneous. Again, the only perceptible rationale for our decision was that best interests equate with society's convention that children bear the surname of their father and not that of their mother.

23. ¶ In *Iverson*, the district court's denial of the unwed mother's petition to change her child's surname from that of the father's--a decision we affirmed on appeal--was based upon facts that the father acknowledged paternity, paid child support and made plans to seek visitation rights. *Iverson,* 241 Mont. at 142-43, 786 P.2d at 2. As noted by Justice Barz:

These three factors, however, do not even touch upon the child's best interest. Instead, these factors merely reinforce traditional notions regarding the "proper" surname for a child. When viewed from a different perspective, these three factors could also be used to justify changing the child's surname to that of the mother's, as the mother has acknowledged maternity, she more than likely pays over $100 per month in supporting the child, and she has assumed the day to day responsibility and care for the child.

*Iverson*, 241 Mont at 143, 786 P.2d at 3 (Barz, J., dissenting). Once again, application of the best interest test alone was merely a guise for implementing our societal preference for preserving the male's lineage through use of the father's surname--precisely the rationale argued by Workman in the instant case.

24. ¶ Justice Barz's citation to *Application of Rossell by Yacono* (N.J. Super. Ct. 1984), 481 A.2d 602, eloquently summarizes the problem:

The emergence of women as equals of men in our society may be our most significant revolution. The acceptance of that emergence is grudgingly slow; it is an acceptance which the courts must not impede. Names, as this case clearly illustrates, are intimately involved with the status of women. Rules of law for changing names cannot be premised upon unacceptable theories of inequality. The right of a mother to have the child bear her name must be recognized as equal to that of the father.

*Rossell*, 481 A.2d at 605.

25. ¶ I agree with Justice Barz: "While the courts are not outwardly and perhaps not even knowingly contributing to this subtle form of discrimination against women, the fact remains that the absence of guidelines in these type of cases only act to impede women's status in society." *Iverson*, 241 Mont. at 145, 786 P.2d at 4 (Barz, J., dissenting).

26. ¶ I would adopt in future cases of this sort the guidelines suggested by Justice Barz in her dissent. Specifically, trial courts should be directed to consider and to make findings of fact as to the following in determining whether the best interests of the child are served in being named after one parent or the other. These factors include:

1. the child's surname preference, if any;

2. the length of time the child has had the surname;

3. the impact of the requested name change on both the mother-child and father-child relationships;

4. any misconduct by either parent that would make that parent's surname possibly deleterious;

5 the child's age;

6. the child's embarrassment or discomfort when bearing a surname other than the family the child is presently living with;

7. the effect a surname may have on easing relations with a new family; and

8. if the child has siblings, the child's relationship to those siblings and the impact on the child of having a surname different from the sibling's surname.

27. ¶ Again, as noted by Justice Barz, "[t]hese factors address more directly a child's best interests when confronted with a name change than the father's magnanimous acknowledgment of paternity, his ability to follow a court order of paying $100 per month to help support the child, and his plans to seek visitation rights with the child." *Iverson,* 241 Mont. at 144, 786 P.2d at 3 (Barz, J., dissenting).

28. ¶ Just as importantly, applying these guidelines in determining best interest will go a

long way toward guaranteeing that each parent's and the child's rights under Article II, Section 4 of Montana's Constitution are protected and toward preventing the subtle discrimination against women that is inherent in our society's paternalistic convention of preferring the father's surname to that of the mother's.

/S/ JAMES C. NELSON

Justice Jim Regnier concurs in the foregoing special concurrence.

/S/ JIM REGNIER